1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ORLANDO MARTIN,

11              Plaintiff,              No. CIV S-05-0557 ALA P

12        vs.

13   ALVARO C. TRAQUINA, et at.,

14              Defendants.              <u>ORDER</u>

15   _____/

16        Orlando Martin, a prisoner confined at California State Prison-Solano ("CSP-Solano"),

17   has brought a pro se civil rights action under 42 U.S.C. § 1983 against Alvaro Traquina, M.D.,

18   CSP-Solana's Chief Medical Officer, Randall Osborn, D.P.M., a podiatrist under contract with

19   CSP-Solano,[1] and Yen Dechant, a registered nurse employed by CSP-Solano.  Mr. Martin asserts

20   that Defendants violated his Eighth Amendment right against cruel and unusual punishment by

21   */////*

22   _____

23        [1] Dr. Osborn's contractor status is immaterial to Mr. Martin's claim against him, because

24   "a private physician . . . under contract with a state to provide medical care to inmates acts
     'under color of state law for purposes of section 1983 when undertaking his duties' to treat an
     inmate."  *Farrow v. West*, 320 F.3d 1235, 1239 n.3 (11th Cir. 2003) (quoting *Carswell v. Bay
     County*, 854 F.2d 454, 456-57 (11th Cir. 1988)); *West v. Atkins*, 487 U.S. 42, 54 (1988).

25

1

1   /////

2   delaying and denying him medical treatment for his painful toenail condition.  Defendants seek

3   summary judgment on Mr. Martin's claim, arguing that they did not act with deliberate

4   indifference.  As explained below, summary judgment will be granted in favor of Ms. Dechant

5   and Dr. Osborn, and in favor of Dr. Traquina to the extent that Mr. Martin claims Dr. Traquina

6   failed to obtain a soft shoe chrono for him.  Summary judgment will be denied with respect to

7   Mr. Martin's claim that Dr. Traquina caused an eleven-month delay in his receipt of surgery for

8   bone-spur removal.[2]

9   **I.     Facts**[3]

10      Mr. Martin entered CSP- Solano on November 12, 2002.  On arrival he asked prison

11  officials to issue him soft shoes, because the standard-issue hard boots hurt his feet.  The

12  officials nevertheless assigned him hard boots, which caused his feet to swell and become

13  blistered.

14      On April 10, 2003 Dr. Oscar Mar examined Mr. Martin and requested that he be

15  examined by a podiatrist.  On April 24, 2003 Mr. Martin was examined again, by a non-

16  podiatrist, and diagnosed with "caculus buildup" on both of his big toes.  The examining doctor

17  made a second request that he see a podiatrist.  Additional requests for Mr. Martin to see a

18  ────────────────

19      [2]  Defendants argue in their reply brief that Mr. Martin "has failed to assert a single admissible fact in opposition to . . . summary judgment" because he filed no affidavits or declarations.  Reply Brief at 3.  They are incorrect.  Mr. Martin's failure to file affidavits or

20  declarations does not preclude this Court from considering as evidence in opposition to summary judgment the allegations contained in Mr. Martin's verified Second Amended Complaint.  *See*

21  *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (when a plaintiff is *pro se*, a court must consider as evidence in opposition to summary judgment all contentions that would be

22  admissible in evidence, are based on personal knowledge, and are contained in pleadings and/or motions whose contents the drafter stated under penalty of perjury are true and correct.).

23

24      [3]  The facts in this section are taken from Mr. Martin's verified Second Amended Complaint.  *See Jones*, 393 F.3d at 923 (allegations contained in a pro se plaintiff's verified

25  pleadings must be considered as evidence for purposes of summary judgment).

1    podiatrist were made in May, June, July, and September of 2003.

2          On June 3, 2003, Mr. Martin wrote a letter to Dr. Traquina.  According to Mr. Martin's

3    verified Second Amended Complaint Dr. Traquina was, as CSP-Solano's Chief Medical Officer,

4    "responsible for arranging medical care for prisoners . . . and specialized care outside the

5    prison."  Mr. Martin's letter stated:

6              I have signed-up to see the . . . Orthopedic doctor since much, I have . . . Blistes
             [sic] up both of my feet, I've been here seven months in the C.D.C. system, and
7              still have not seen them, I talk with the "Annex" doctor's and they say they can't
             help me about my feet . . . the boots i[s] making my feet very bad, and the pain is
8              getting worse . . . I've tried my counsol [sic] . . . [and] annex doctor's, but know
             [sic] one seems to help, so now I come to you for your professional help.
9

10   Second Amended Complaint, Exh. 20.  Upon receiving the letter, Dr. Traquina made a copy of it

11   and sent it to a Dr. Toppenberg so that Dr. Toppenberg could interview Mr. Martin.  Second

12   Amended Complaint, Memorandum of Points and Authorities, at 3.  Mr. Martin was first

13   examined by a podiatrist on September 12, 2003.

14         On October 27, 2003, Dr. Osborn surgically removed both of Mr. Martin's big toenails.

15   Mr. Martin suffers from Hepatitis-C, and therefore is not supposed to take Motrin because it

16   hurts his liver.  Mr. Martin told Dr. Osborn before the toenail-removal surgery that he had

17   Hepatitis-C, but Dr. Osborn nevertheless prescribed him Motrin for post-operation pain.[4]  Dr.

18   Osborn did not prescribe Mr. Martin any antibiotics, open-toed sandals, a wheelchair, crutches,

19   or a cane.  Nor did Dr. Osborn arrange for Mr. Martin to be transported back to his living

20   quarters or issue Mr. Martin a medical chrono, which is a form that would have instructed prison

21   _____

22         [4] Mr. Martin makes contradictory statements regarding what Dr. Osborn prescribed him.
     In his Second Amended Complaint, he alleges that "Dr. Osborn didn't give [him] any medication
23   because after [Mr. Martin] informed him [that he had] 'Hepatitis-C' Osborn told [Mr. Martin]
     'he didn't know what to prescribe him and he didn't prescribe anything' . . ."  In his opposition
24   brief, however, Mr. Martin asserts that Dr. Osborn did prescribe him Motrin.  Dr. Osborn states
     in his summary judgment brief and declaration that he prescribed the Motrin.

25
                                                3

1   personnel to bring Mr. Martin's food to him in his quarters for one week.

2       Because Mr. Martin was not issued a wheelchair, given a ride back to his living quarters,

3   or issued a medical chrono, he was forced to walk almost half a mile back to his prison building

4   after the surgery, and to walk to the dining room for his meals during the ensuing week.  These

5   trips caused Mr. Martin extreme pain and bleeding in his feet, and caused his wounds to remain

6   open.  On November 3, 2003, at Mr. Martin's follow-up medical exam, Dr. Dwayne Highsmith

7   determined that the post-surgical site had become infected and prescribed Mr. Martin antibiotics

8   and additional pain medication.  Mr. Martin later developed a bone spur on his right big toe,

9   which had not been there before the surgery.

10       On each of the three days immediately following his surgery, Mr. Martin traveled to the

11   prison clinic where Ms. Dechant worked as a nurse.  There, he asked Ms. Dechant for medical

12   treatment to alleviate his pain.  He showed her his toes, which were bleeding, and she gave him

13   fresh bandages.  She did not send him to see a doctor, however, and told him he had to wait to

14   see a doctor until his followup visit on November 3, 2003.  She stated that "the bleeding [was]

15   normal" and would "stop in due time."  Ms. Dechant submits uncontroverted evidence that Mr.

16   Martin's feet were not infected when she examined them on October 29, 2003, that she examined

17   them again on November 3, 2003, and that on that date she noticed that "[h]is big toe had

18   developed some redness and was slightly swollen with a small amount of drainage."  Dechant

19   Dec., ¶ 6.[5]  She states that she did not call a doctor on November 3, 2003 because Mr. Martin

20   was scheduled to see a doctor later that morning for his follow-up exam and there was no

21

22       [5] Mr. Martin asserts, in his brief opposing Ms. Dechant's summary judgment motion,
23   that his big toe was infected on October 28, 2003, when he first visited the clinic.  Opposition at
     9.  The Court cannot consider that allegation as evidence, however, because Mr. Martin did not
24   include an affidavit with the brief attesting under penalty of perjury to the truth of its contents,
     and the brief therefore is not a verified motion.

25                            4

1    emergency that would warrant calling the doctor immediately. *Id.*

2    On January 16, 2004, Dr. Highsmith examined Mr. Martin and determined that he was

3    still suffering from pain in his right toe.  A Dr. Daniel Bunnell examined Mr. Martin on February

4    4, 2004, and stated that there was no abnormality of the bone suggesting osteomyelites.  Also on

5    /////

6    February 4, 2004, Dr. Traquina examined Mr. Martin and noted that he was still suffering from

7    pain in his toe, although it had healed and showed no signs of infection.

8    On April 23, 2004, Mr. Martin was diagnosed with a bone spur on his right big toe.  The

9    next day, on April 24, 2004, a Doctor Chin "requested 'URGENT' medical care for [Mr. Martin]

10   to remove the bone spar [sic] and Dr. Highsmith was appointed to do the surgery."  According to

11   CDC-Solano regulations, requests for care that are designated as "urgent" medical needs require

12   treatment within twenty-for hours.  Nevertheless, Mr. Martin did not receive the bone spur

13   removal surgery for another fifteen months.  The surgery was finally performed in July 2005.[6]

14   Mr. Martin filed at least two administrative complaints at CSP-Solano between 2002 and

15   2005.  He filed the first complaint in December 2003, requesting additional medical care for his

16   feet and calling for an administrative investigation into the medical care he received from Dr.

17   Osborn and Ms. Dechant.  On February 3, 2004, Dr. Traquina issued a Second Level response to

18   the complaint.  The response stated that Mr. Martin's request was partially granted on the ground

19   that Mr. Martin had already received appropriate medical care, and that Dr. Traquina had

20   interviewed Mr. Martin and 'verified that both feet were well healed and there were no signs of

21   infection." "Additionally," Dr. Traquina said in the response, "I advised you to have a follow-up

22

23        [6] There is a dispute regarding when Mr. Martin received the bone spur-removal surgery.
     Mr. Martin maintains the surgery occurred in July 2005, while Dr. Traquina states it occurred on
     June 4, 2005.  For purposes of summary judgment the Court must assume the truth of Mr.
24   Martin's assertion that the surgery was performed in July 2005.

25                                                5

1    consultation with the podiatrist to discuss the x-rays results and to request soft shoes chrono."

2    Dr. Traquina concluded that Mr. Martin had "failed to provide evidence that proves that Dr.

3    Osborn and RN Deschant [sic] acted unprofessionally or have neglected your medical care."

4    Second Amended Complaint, Exh. 10.

5    /////

6    /////

7          On April 7, 2004, Mr. Martin filed his second complaint: a CDC form entitled

8    "Reasonable Modification or Accommodation Request."[7]  He wrote on the form that the toenail

9    removal surgery "caused me to get a 'bone spur' in my 'right toe,'" and complained of blisters

10   and pain in his foot.  He requested "an[] emergency appointment with an[] outside podiatry

11   doctor to remove the bone spur . . ."  Second Amended Complaint, Exh. 12.

12         On June 7, 2004, Dr. Traquina issued a Second Level response to the April 7, 2004

13   complaint, stating "your appeal is partially granted in that you are receiving appropriate

14   treatment for your post-op complications from Dr. Highsmith, who is one of our consulting

15   physicians."  Exh. 12.  The response explained that on April 23, 2004 Dr. Chin had examined

16   Mr. Martin, "noted that your wound was healing well, with no sign of infection," and concluded

17   that the results of an x-ray were "negative."  Dr. Traquina also stated that Dr. Highsmith had

18   noticed on June 4, 2004 that Mr. Martin had "a slight dorsal deformity of [his] right toe," and

19   that Mr. Martin was scheduled to see Dr. Highsmith again in thirty days.  Exh. 12.  On July 19,

20   2004, Mr. Martin's complaint was denied at the Director's level. Exh. 12.

21   **II.    Summary Judgment Standard**

22   _____

23         [7]  The form stated, "You may use this form to request specific reasonable modification or
     accommodation which . . . would enable you to participate in a service, activity, or program
     offered by the . . .Institution/facility, for which you are otherwise qualified/eligible to
24   participate." Second Amended Complaint, Exh. 12.

25                                                6

1      Summary judgment may be granted in favor of a party "if the pleadings, depositions,

2 answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

3 there is no genuine issue as to any material fact and that the moving party is entitled to judgment

4 as a matter of law." FED. R. CIV. P. 56(c).   A party's motion for summary judgment must be

5 granted "after adequate time for discovery and upon motion . . . against a party who fails to make

6 a showing sufficient to establish the existence of an element essential to that party's case, and on

7 /////

8  which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317,

9 322 (1986).

10      Where the party resisting a motion for summary judgment is *pro se*, the court "must

11 consider as evidence in his opposition to summary judgment all of [his] contentions offered in

12 motions and pleadings, where such contentions are based on personal knowledge and set forth

13 facts that would be admissible in evidence, and where [he] attested under penalty of perjury that

14 the contents of the motions or pleadings are true and correct."  *Jones v. Blanas*, 393 F.3d 918,

15 923 (9th Cir. 2004) (citing cases).

16 **III.    Discussion**

17      Mr. Martin contends that Defendants violated his Eighth Amendment rights by failing to

18 provide him with proper medical care, thus exacerbating the pain in his toes and causing him to

19 suffer an infection and bone spur.  "'The unnecessary and wanton infliction of pain upon

20 incarcerated individuals under color of law constitutes a violation of the Eight Amendment.'"

21 *Toguchi v. Chung*, 391 F.3d 1051, 1056 (9th Cir. 2004) (quoting *McGuckin v. Smith*, 974 F.2d

22 1050, 1059 (9th Cir. 1992)).  "A violation of the Eighth Amendment occurs when prison

23 officials are deliberately indifferent to a prisoner's medical needs."  *Id.* at 1057.

24      "In the Ninth Circuit, the test for deliberate indifference consists of two parts."  *Jett v.*

25

*Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).  "First, the plaintiff must show a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  *Id.* (quoting *McGuckin*, 974 F.2d at 1059).  "Second, the plaintiff must show the defendant's response to the need was deliberately indifferent."  *Id.*   A plaintiff can show a defendant's response was deliberately indifferent by demonstrating "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."  *Id.*  "Indifference 'may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.'"  *Id.* (quoting *McGuckin*, 974 F.2d at 1059).

"A prison official acts with 'deliberate indifference . . . only if [he or she] knows of and disregards an excessive risk to inmate health and safety."  *Toguchi*, 391 F.3d 1057.  "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'"  *Id.*  (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  "'[D]eliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm.'"  *Id.* at 1057 n.4 (quoting *Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003)).

There is no dispute in this case that Mr. Martin suffered from a "serious medical need." Defendants do not contest that he suffered from caculus buildup, and later a bone spur, in his toes, which caused severe pain that was certain to continue if left untreated.  The only question, therefore, is whether each of the Defendants failed to respond to Mr. Martin's medical need despite knowledge that their failure to respond created a substantial risk of serious harm to him.

A.      **Ms. Dechant**

1    Mr. Martin contends that Ms. Dechant acted with deliberate indifference by failing to call

2    a doctor or send him to a doctor when he visited the prison clinic and showed her his bleeding

3    toes on the three days following his October 27, 2003 toenail-removal surgery.  Ms. Dechant's

4    actions, he argues, caused his toes to become infected and caused him unnecessary pain.

5    Ms. Dechant presents uncontroverted evidence that Mr. Martin visited the annex clinic

6    on October 29, 2003, and that at that time his wounds were clean and showed no swelling, active

7    bleeding, or signs of infection.[8]  She presents further uncontroverted evidence that Mr. Martin

8    visited the clinic again on the morning of November 3, 2003, that by then his big toe "had

9    developed some redness and was slightly swollen with a small amount of drainage," and that she

10   decided not to call a doctor because Mr. Martin was scheduled to see the doctor later that

11   morning.

12   Mr. Martin's evidence is insufficient to create a genuine issue of material fact regarding

13   whether Ms. Dechant "kn[ew] of [or] disregard[ed] an excessive risk to [his] health and safety."

14   *Toguchi*, 391 F.3d 1057.  Nothing in the record indicates that Ms. Dechant knew of a significant

15   risk that failure to clean Mr. Martin's wounds or send him to a doctor on the days after his

16   surgery would cause him significant injury or unnecessary pain.  On the contrary, Mr. Martin

17   asserts in his Second Amended Complaint that Ms. Dechant stated that the bleeding on his toes

18   was "normal" and would "stop on its own."  Second Amended Complaint, Memorandum of

19   Points and Authorities, at 14.  That statement indicates that Ms. Dechant believed there was no

20   significant danger of infection.  While she may have been wrong, that mistake is insufficient to

21

22       [8] Mr. Martin alleges in his opposition to Ms. Dechant's summary judgment motion that
     his wound was infected when he visited the clinic on October 28, 2003, the day after his surgery,
23   and that Ms. Dechant instructed another clinic employee not to clean his wound.  The Court
     cannot consider these allegations as evidence in opposition to Ms. Dechant's motion for
24   summary judgment because they Mr. Martin's opposition brief is not verified.

25                                                          9

constitute deliberate indifference.  *Toguchi*, 391 F.3d at 1057 ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights.").  *See also Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").  Summary judgment must therefore be granted in favor of Ms. Dechant.

### B.   Dr. Osborn

Mr. Martin asserts that Dr. Osborn acted with deliberate indifference by (1)  prescribing him Motrin, when he could not take Motrin because he suffered from Hepatitis-C, and failing to prescribe any other means of pain relief; (2) failing to ensure that he received the Motrin he was prescribed;  (3) failing to prescribe him anti-infection medication; (4) performing the surgery in an unsanitary room;  (5) failing to obtain a consent form from Mr. Martin before surgically removing his toenails, and performing the surgery after Mr. Martin asked that Dr. Highsmith perform the surgery instead.  These contentions are addressed separately.

#### 1.   Prescribing Motrin Despite Mr. Martin's Hepatitis-C, and Failing to Provide Other Means of Pain Relief

Mr. Martin contends that Dr. Osborn acted with deliberate indifference by prescribing him Motrin, which Mr. Martin could not take because of his Hepatitis-C, and by failing to provide him with any other means of pain relief.  He contends that Dr. Osborn should have prescribed him additional painkillers, open-toed sandals, a crutch or cane, and/or a wheelchair, written him a medical chrono providing for his food to be brought to him in his room for one week, and arranged for him to be transported from the surgery back to his living quarters.  He states he asked Dr. Osborn for a wheelchair, a ride back to his building after the surgery, and a medical chrono for his food to be brought to him for one week, but that Dr. Osborn refused his requests.

10

1    Dr. Osborn contends that he did not believe Mr. Martin faced a significant risk of post-

2  operative pain, and that Mr. Martin never asked him for a wheelchair, crutches, soft shoes "or

3  any other remedial [pain relief] measure[s]." Osborn Decl., ¶ 11.  He did not prescribe a

4  wheelchair, he states, because it "was not medically required after removal of [Mr. Martin's]

5  toenails and for this type of procedure would never be provided to any patient under the

6  circumstances." Osborn Decl. at ¶ 7.  He states that "[i]mmediately after surgery for removal of

7  toenail there is no pain because the toe is still under the effects of local anesthetic for

8  approximately 2-3 hours." Osborn Decl. at ¶ 7.

9    Mr. Martin has failed to present sufficient evidence to create a genuine issue of fact

10  regarding whether Dr. Osborn acted with deliberate indifference in failing to prescribe him pain-

11  prevention measures for the journey back to his living quarters.  No evidence suggests that Dr.

12  Osborn knew that Mr. Martin would experience pain during the walk, that Mr. Martin's shoes

13  hurt his feet, or that the walk back to Mr. Martin's living area was half a mile long.[9]  It is

14  undisputed that Dr. Osborn believed the local anesthetic would prevent Mr. Martin from

15  experiencing pain for two to three hours after the surgery.  Although Dr. Osborn's assessment of

16  Mr. Martin's need for pain-prevention immediately after surgery may have been incorrect,

17  "[m]ere negligence in diagnosing or treating a medical condition, without more, does not violate

18  a prisoner's Eighth Amendment rights." *Toguchi*, 391 F.3d at 1057.

19    Mr. Martin also has failed to present sufficient evidence to create a genuine issue of fact

20  as to whether Dr. Osborn acted with deliberate indifference in failing to provide means other

21  than Motrin to mitigate Mr. Martin's pain more than two to three hours after surgery.   Mr.

22  _____

23    [9]  Mr. Martin asserts in his opposition brief that he asked Dr. Osborn for soft shoes, but
   the Court cannot consider that allegation because the opposition brief is not a verified motion.

24  Mr. Martin presents no affidavits or other evidence to support his claim that he asked Dr. Osborn
   for soft shoes.

25                                                    11

1   Martin states that he had Hepatitis-C, but presents no evidence that he informed Dr. Osborn of

2   any specific risk he would face if he took Motrin.  This Court has searched for, but been unable

3   to find, any judicially-noticeable medical authority indicating that Motrin is unsafe for patients

4   who have Hepatitis-C.  *See United States v. Howard*, 381 F.3d 873, 880 n.7 (9th Cir. 2004)

5   (parenthetically citing *Lolli v. County of Orange*, 351 F.3d 410 (9th Cir. 2003) for the

6   proposition that "*[w]ell-known* medical facts are the types of matters of which judicial notice

7   may be taken." (emphasis added)).  The evidence is therefore not sufficient to permit a

8   reasonable jury to conclude that Dr. Osborn knew of a risk, or even that a risk existed, that Mr.

9   Martin would suffer medical harm or unnecessary pain if he was prescribed Motrin.  Nor is there

10  any evidence that Dr. Osborn actually knew that Mr. Martin would need other means of pain

11  relief.  Dr. Osborn's apparent belief that Motrin would sufficiently control Mr. Martin's pain

12  precludes the existence of a genuine issue of material fact as to whether he acted with deliberate

13  indifference.

14          **2.      Failure to Ensure that Mr. Martin Received the Prescribed Pain
                       Medication**
15

16          Mr. Martin contends that Dr. Osborn "intentionally failed to place the [Motrin]

17  prescription before the MTA so he/she could have the pharmacist fill it thereby denying him the

18  badly needed pain killing medication he needed."  Opposition Brief at 2.  No evidence in the

19  record supports that assertion.   It therefore is insufficient to create a genuine issue of material

20  fact for purposes of summary judgment.

21          **3.      Failure to Prescribe Anti-Infection Medication**

22          Mr. Martin also asserts that Dr. Osborn knew of and disregarded a significant risk that his

23  toes would become infected if Dr. Osborn did not prescribe anti-infection medication.  He states

24  that he "was a prisoner[] living in a housing u[nit] holding more than 200 other prisoners, that in

25                                                  12

such a housing unit the p[lace] wasn't likely to be clean especially since many prisoners get sick there and . . . most of the prisoners [were] on some type of powerful medication and there wasn't any way such a building could be kept clean . . ." Opposition Brief at 3. "[A]ny good doctor," he argues, "would have recognized the risk of infection and took proper action to prevent it by providing the plaintiff with anti infection medication . . ." *Id.*

Mr. Martin's argument is insufficient to establish a genuine issue of fact as to deliberate indifference. At most, it suggests the existence of facts that, *if known to Dr. Osborn, could have or should have* alerted Dr. Osborn that Mr. Martin faced a significant risk of infection. However, "[i]f a [prison official] should have been aware of [a] risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Toguchi*, 391 F.3d at 1057 (quoting *Gibson*, 290 F.3d at 1188). No evidence in the record suggests that Dr. Osborn actually knew the nature of Mr. Martin's living conditions. Even assuming Dr. Osborn did know the nature of those conditions, and should have concluded that they posed a significant risk of infection, there is no evidence that Dr. Osborn actually made that inference. The only evidence in the record relating to Dr. Osborn's subjective knowledge is that he knew toenail-removal surgery posed a small risk of infection, and that he believed the risk was small in Mr. Martin's case. The record contains no evidence of deliberate indifference.

### 4.    Performing Toenail-Removal Surgery in an Unsanitary Room

Mr. Martin asserts that "[t]he operating room in the primary clinic wasn't properly cleaned 'sanitized' for Osborn to [d]o the surgery yet he did it anyway." Second Amended Complaint, ¶ 12. He fails, however, to support that assertion with any specific allegations regarding the condition of the room. *See Adams v. Pate*, 445 F.2d 105, 107 (7th Cir. 1971) (plaintiff's allegation of "unsanitary living conditions" was insufficient to state an Eighth Amendment claim, because it was "unaccompanied by any specific allegations, which if proved,

13

would establish that the segregated confinement constituted cruel or unusual punishment . . .")

Mr. Martin also presents no evidence that the operating room conditions caused his infection or

otherwise harmed him.  Summary judgment is therefore proper as to Mr. Martin's allegation

with respect to the operating room conditions.

### 5.    Failure to Obtain a Consent Form/ Performing Surgery Despite Mr. Martin's Requests for Dr. Highsmith

Mr. Martin asserts that "[Dr.] Osborn forced himself on the Plaintiff and failed to get the

Plaintiff to sign a consent form [before the toenail-removal surgery,] thereby violating state law

by operating on him without a signed consent . . ." Opposition Brief at 6.  He contends that he

"made it clear to Osborn that he didn't want Osborn to do the surgery [and] that he wanted Dr.

Highsmith to do the surgery and . . . [Osborn] threatened to deny [Mr. Martin] surgery for

months if he didn't allow him to do the surgery, [saying] 'If I don't do this surgery today you

will have to wait another six months or more for surgery." Opposition Brief at 5.  He claims he

"was in too much pain to wait another six months for surgery so . . . he allowed Osborn to do the

surgery . . ." *Id.* at 6.

These allegations are insufficient to create a triable issue of fact as to whether Dr. Osborn

violated Mr. Martin's Eighth Amendment rights.  They indicate merely that Dr. Osborn informed

Mr. Martin of his options:   permit Dr. Osborn to perform the surgery, or wait six months to have

Dr. Highsmith do it.  No evidence indicates that Dr. Osborn lied when he said Dr. Highsmith

would not be available for six months, or that Dr. Osborn otherwise coerced Mr. Martin into

permitting him to remove his toenails.

Nor has Mr. Martin presented any evidence that he was harmed by Dr. Osborn

performing the surgery instead of Dr. Highsmith.  Nothing in the record suggests that Dr.

Highsmith would have performed the toenail-removal surgery differently than did Dr. Osborn, or

14

1   that Dr. Osborn was unqualified to perform the surgery.  Mr. Martin argues that Dr. Highsmith

2   would have done a better job than Dr. Osborn, because Dr. Highsmith gave Mr. Martin crutches

3   and a medical chrono after removing his bone spur in July 2005.  The difference in the post-

4   operation treatment Mr. Martin received from Drs. Osborn and Highsmith, however, likely

5   resulted from the different procedures each doctor performed.  It does not indicate that the two

6   doctors would have taken different approaches to toenail-removal.

7   Mr. Martin also has not presented evidence that he was harmed by Dr. Osborn's failure to

8   obtain a consent form from him.  He does not allege that he would not have signed such a form,

9   or that he did not choose to have the surgery.  Instead, he admits that he chose to be operated on

10   by Dr. Osborn instead of waiting for six months to be operated on by Dr. Highsmith.  Summary

11   judgment must be granted in favor of Dr. Osborn.

12   **C.     Dr. Traquina**

13   Mr. Martin argues that Dr. Traquina violated his Eighth Amendment rights by (1)

14   delaying Mr. Martin's toenail-removal surgery for four months after Mr. Martin sent Dr.

15   Traquina his June 3, 2003 letter requesting medical attention; and (2) delaying the bone spur-

16   removal surgery for eleven months "after Dr. Chen issued an 'URGENT' request for bone-spur

17   surgery on 4-24-04," and (3) causing Mr. Martin's numerous requests for a soft shoe chrono to

18   be denied.  He contends that Dr. Traquina, as CSP-Solano's Chief Medical Officer, is

19   "responsible for ensuring that medical care to prisoners [is] provided by his medical staff, for

20   scheduling medical appointments outside the prison when a prisoner needs specialized treatment

21   or evaluation, [and] for ensuring that his medical staff follows all laws [and] constitutional

22   amendment rights."  Complaint at 2.  According to Mr. Martin, Dr. Traquina has an "illegal stall,

23   delay, deny policy of withholding medical care for prisoners as long as possible."  Second

24   Amended Complaint, Form Complaint, at 3.

25

15

1              1.      **Delays in Surgery**

2      "[W]hen . . . a claim alleges 'mere delay of surgery,' a prisoner can make 'no claim for

3  deliberate medical indifference unless the denial was harmful.'" *McGuckin*, 974 F.2d at 1060

4  (quoting *Shapley v. Nevada Board of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985)

5  (per curiam)).  The unnecessary continuation of a prisoner's condition during a delay in

6  receiving surgery fulfills the "harm" requirement.  *Id.* at 1062.  Mr. Martin has failed to present

7  any evidence that he was harmed by the delay in receiving his toenail-removal surgery, because

8  there is no evidence that the toenail-removal surgery was necessary to alleviate the pain in his

9  feet.  In fact, all the evidence indicates that his pain worsened after the toenails were removed.

10  Consequently, even assuming that Dr. Traquina delayed the toenail removal surgery, that delay

11  cannot be the basis of a § 1983 claim.

12      Mr. Martin has, however, sufficiently alleged that he was harmed by the delay in his bone

13  spur-removal surgery, because he asserts that the delay caused him constant pain.  He has also

14  submitted sufficient evidence to create a genuine issue of fact as to whether Dr. Traquina was

15  responsible for that delay, and acted with deliberate indifference in failing promptly to order the

16  surgery.  He alleges that Dr. Traquina was responsible for scheduling surgeries, and that Dr.

17  Traquina knew that Dr. Chin had ordered bone-spur removal surgery to be performed on Mr.

18  Martin within twenty-four hours on April 24, 2004.  He also attaches to his Second Amended

19  Complaint Dr. Traquina's Second Level response, dated March 4, 2005 - eleven months after Dr.

20  Chin ordered that Mr. Martin receive "urgent" surgery.  Second Amended Complaint at 16-17.

21  In the response, Dr. Traquina acknowledges that Mr. Martin claims he is "going through

22  suffering due to your need for additional toe surgery, and states merely "[w]e are sorry for the

23  delay in this rescheduling of your podiatry appointment."  Exh. to Opposition to Summary

24  Judgment.  Dr. Traquina's response provides no explanation as to why eleven months have

25

1   passed without Mr. Martin receiving the bone spur-removal surgery that Doctor Chin stated

2   should have been done within twenty-four hours.   This evidence is sufficient to create a triable

3   issue of fact as to whether Dr. Traquina acted with deliberate indifference. *See Farrow*, 320

4   F.3d 1235, 1246-47 (11th Cir. 2003) (triable issue of fact existed as to deliberate indifference,

5   where plaintiff prisoner suffered a"substantial and inordinate delay" in receiving dentures and

6   his dentist was aware he was experiencing pain, bleeding gums, and weight loss due to lack of

7   dentures); *Hunt v. Dental Department*, 865 F.2d 198, (9th Cir. 1989) ( defendant prison medical

8   administrator, dentist, and medical assistant not entitled to summary judgment on plaintiff

9   prisoner's Eighth-Amendment claim arising from a three-month delay in receiving dentures,

10  where defendants knew the lack of dentures was causing severe pain, weight loss, and permanent

11  damage to plaintiff's teeth); *Hathaway v. Coughlin*, 841 F.2d 48, 50-51 (2nd Cir. 1988)

12  (reversing summary judgment in favor of defendant prison administrators on plaintiff prisoner's

13  claim that defendants acted with deliberate indifference in causing a delay of over two years in

14  arranging for surgery to correct broken pins in plaintiff's hip).

15  /////

16  /////

17                      **2.       Denial of Soft Shoe Chrono**

18              Mr. Martin also contends that Dr. Traquina is liable under § 1983 because he "refused to

19  approve a soft shoe chrono [requested by Mr. Martin] in 2003" and "refused [Mr. Martin's]

20  request for soft shoes from Nov. 2002 all the way till after the bad surgery or 11-27-03 and well

21  into 2004 before he received the soft shoe chrono."  Opposition Brief at 23.  These allegations

22  are insufficient to withstand summary judgment, because Mr. Martin provides no evidence that

23  Dr. Traquina was responsible for approving soft shoe chronos or had any control over whether

24  Mr. Martin received soft shoes.  Mr. Martin admits that when Dr. Traquina received Mr.

25                                          17

1   Martin's June 3, 2003 letter complaining of foot pain Dr. Traquina "made a copy of the letter and

2   sent it to Dr. Toppenberg for him to interview Plaintiff."  Second Amended Complaint,

3   "Memorandum of Points and Authorities," at 3.  Dr. Traquina presents uncontroverted evidence

4   that he reviewed Mr. Traquina's second level appeals, personally interviewed Mr. Martin on

5   February 2, 2004, and "advised him to have a follow-up consultation with the podiatrist to . . .

6   request a soft shoe chrono."  Traquina Decl. at ¶ 4.  That evidence suggests that at CSP-Solano

7   soft shoe chronos were to be requested by the examining podiatrist, and not by the Chief Medical

8   Officer.  Dr. Traquina is therefore entitled to summary judgment on Mr. Martin's claim that Dr.

9   Traquina failed to secure him a soft shoe chrono.

10  **IV.      Conclusion**

11        For the foregoing reasons, summary judgment on Mr. Martin's Eighth Amendment

12  claims is GRANTED in favor of Ms. Dechant and Dr. Osborn, and GRANTED in favor of Dr.

13  Traquina with respect to Mr. Martin's claims that Dr. Traquina delayed his toenail-removal

14  surgery and prevented him from receiving a soft shoe chrono.  Summary judgment is DENIED

15  with respect to Dr. Traquina to the extent Mr. Martin asserts that Dr. Traquina delayed his bone

16  spur-removal surgery.

17  /////

18        Accordingly, IT IS HEREBY ORDERED that:

19        1. Defendant Osborn's September 21, 2006, motion for summary judgment is

20  GRANTED;

21        2. Defendant Dechant's September 21, 2006, motion for summary judgment is

22  GRANTED; and

23        3. Defendant Traquina's September 21, 2006, motion for summary judgment is

24  GRANTED with respect to Mr. Martin's claims that Dr. Traquina delayed his toenail-removal

25

surgery and prevented him from receiving a soft shoe chrono, and DENIED with respect to Mr.

Martin's claim that Dr. Traquina delayed his bone spur-removal surgery.

DATED: August 2, 2007

                                          /s/ Arthur L. Alarcón
                                          UNITED STATES CIRCUIT  JUDGE
                                          Sitting by Designation